# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**EQUAL EMPLOYMENT OPPORTUNITY**   )
**COMMISSION,**                                         )
                                                                )
          **Plaintiff,**                            )         **Civil Action No.**
                                                                )         **18-10909-FDS**
      **v.**                                             )
                                                                )
**AVIATION PORT SERVICES, LLC,**            )
                                                                )
          **Defendant.**                         )
_____)

## MEMORANDUM AND ORDER ON PLAINTIFF'S
## <u>MOTION FOR DEFAULT JUDGMENT</u>

**SAYLOR, C.J.**

      This is a workplace discrimination action.  The United States Equal Employment

Opportunity Commission ("EEOC") has brought suit on behalf of six individuals, former

employees of defendant Aviation Port Services, LLC ("APS") at Logan Airport in Boston.  The

EEOC alleges that APS discriminated against the six individuals, all Muslim women, when it

refused to grant them a religious accommodation to its uniform policy and terminated their

employment.  The complaint alleges that APS violated § 703(a)(1) and § 704(a) of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-3(a).

      APS defended the action through the discovery stage, but its counsel eventually withdrew

his appearance and a notice of default was issued on December 6, 2019.  The EEOC has moved

for a default judgment seeking $62,262.75 in back pay, $10,273.35 in prejudgment interest,

$1,800,000 in compensatory and punitive damages, and injunctive relief.  For the following

reasons, the Court will grant a default judgment and award damages, but in lower amounts than

sought by the EEOC.

I.    **Background**

A.    **Factual Background**

The facts are summarized below as set forth in the complaint unless otherwise noted.[1]

Aviation Port Services, LLC, is a company that operates in nine airports across the United States. (Slattery Dep. 50:14-19). During the 2016-2017 time period, it employed approximately 1,100 people across all its locations. (*Id.* 58:8-13). The company now employs approximately 250 people. (*Id.* 58:7). At one time, APS had operations in Boston, Massachusetts, principally at Logan Airport. (Hussain Decl. ¶ 3). The company closed its Boston offices in February 2018. (Slattery Dep. 59:2-11).

Sagal Abdi, Haredo Ali, Suad Maow, Fatima Mohamud, Khaibo Mohamud, and Tassabih Sidik began working for APS as Passenger Service Agents ("PSAs") between early and mid-2016. (Compl. ¶ 14). They allege that as followers of Islam, they have a sincerely held religious belief in modest dress. (*Id.* ¶ 13). They wear long skirts and hijabs, and do not wear short skirts or form-fitting clothing. (*Id.*).

APS maintained a policy that required its female PSAs to wear pants or a knee-length skirt. (*Id.* ¶ 15). However, before November 2016, the six complaining PSAs were permitted to wear long skirts as a religious accommodation. (*Id.* ¶ 16). Between November 2016 and January 2017, APS informed them that this accommodation would not continue, and that they

---

[1] Because defendant has defaulted for failure to plead or otherwise defend, it is "taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which the damages will be calculated." *Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 62-63 (1st Cir. 2002) (quoting *Franco v. Selective Ins. Co.*, 184 F.3d 4, 9 n.3 (1st Cir. 1999)). Before entering a default judgment, a court may examine the complaint, taking all well-pleaded factual allegations as true, to determine its legal sufficiency. *Ramos-Falcon v. Autoridad de Energia Electrica*, 301 F.3d 1, 2 (1st Cir. 2002); *Quirindongo Pacheco v. Rolon Morales*, 953 F.2d 15, 16 (1st Cir. 1992). On a motion for default judgment, a court may also consider any affidavits or evidence on the record. *See KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 17-20 (1st Cir. 2003).

would be terminated if they did not begin to wear pants or knee-length skirts. (*Id.* ¶¶ 17-18). Between November 2016 and January 2017, the six individuals informed APS that wearing such clothing conflicted with their religion and requested a religious accommodation to continue wearing long skirts. (*Id.* ¶¶ 19-21).

In some of its pleadings, although not in its answer, APS has stated that the reason for its dress-code policy against long skirts was a safety concern that such clothing could be caught in moving conveyor belts. (Slattery Aff. ¶ 7, Docket No. 15 Ex. B). However, Samira Hussain, the Safety, Training, and Quality Control Coordinator for APS from January 2016 to March 2017, has stated that she did not have any safety concerns about PSAs who wore long skirts, nor did any manager or supervisor express such a concern. (Hussain Decl. ¶¶ 10-11).

On January 14, 2017, APS terminated the employment of all six individuals for failing to comply with its dress-code policy. (Compl. ¶ 22; *see also* Ali Termination Notice, Docket No. 43 Ex. H; Sidik Termination Notice, Docket No. 43 Ex. I; Abdi Termination Notice, Docket No. 43 Ex. J; Fatima Mohamud Termination Notice, Docket No. 43 Ex. K; Khaibo Mohamud Termination Notice, Docket No. 43 Ex. L). The EEOC alleges that APS terminated their employment because of their religion and in retaliation for engaging in protected activity. (Comp. ¶ 12).

In February 2017, Sean Slattery asked Samira Hussain and Imane Ezzahir, two APS employees in Boston, for written statements stating that APS did not discriminate against them. (Hussain Decl. ¶ 15). Slattery knew that both Hussain and Ezzahir were Muslim. (*Id.*). Hussain does not wear a hijab or long skirt as part of her religious practices. (*Id.* ¶ 8). She e-mailed the requested written statement to Slattery on February 24, 2017. (*Id.* ¶ 15).

As PSAs, the six individuals were paid $12 per hour with a monthly $50 stipend for

public transportation.  (Pl.'s Mem. in Supp. of Mot. for Default J. 7).  After their termination on January 14, 2017, the complaining PSAs sought to secure comparable jobs.  Only Abdi was able to do so, in March 2017.  (Abdi Decl. ¶ 8).  Ali, Fatima Mohamud, and Sidik eventually found employment at lower pay.  (Ali Decl. ¶¶ 7-8; Fatima Mohamud Decl. ¶¶ 7-8; Sidik Decl. ¶¶ 7-9).  Maow, who was already working a full-time job in addition to working at APS part-time, decided to focus on her full-time job and apply to school rather than seek a replacement for her APS income.  (Maow Decl. ¶¶ 7-9).  Khaibo Mohamud was unable to find alternative employment and decided to focus on schoolwork rather than seek a replacement job.  (Khaibo Mohamud Decl. ¶ 8).

The six individuals allege that due to their termination they suffered from feelings of shock, sadness, guilt, humiliation, confusion, and embarrassment.  (Abdi Decl. ¶ 10; Ali Decl. ¶¶ 9, 11; Maow Decl. ¶ 10; Fatima Mohamud Decl. ¶ 9; Khaibo Mohamud ¶ 11; Sidik Decl. ¶¶ 10-11).  They allege that they feared future discrimination and worried that they could not be accepted as Muslims in America. (Abdi Decl. ¶ 9; Ali Decl. ¶ 10; Maow Decl. ¶¶ 10-13; Fatima Mohamud ¶ 11; Khaibo Mohamud ¶ 10).  They further allege that they felt helpless, worthless, and guilty because they could no longer provide financial support for their families. (Abdi Decl. ¶ 10; Ali Decl. ¶ 12; Fatima Mohamud ¶ 11; Khaibo Mohamud ¶ 9; Sidik Decl. ¶ 12).

B.  **Procedural Background**

The EEOC filed the complaint in this case on May 7, 2018.  The complaint alleges that APS denied the six PSAs reasonable religious accommodations, and discharged them because of their religion, in violation of § 703 of Title VII, 42 U.S.C. § 2000e-2(a)(1).  It also alleges that APS discharged them in retaliation for engaging in protected activity—specifically, complaining of religious discrimination and requesting a religious accommodation to the uniform policy—in

violation of § 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

APS first defaulted in the fall of 2018.  On September 12, 2018, the court entered a notice of default as to APS for failure to plead or otherwise defend pursuant to Fed. R. Civ. P. 55(a). On September 21, attorney Jonathan Lent filed a notice of appearance for APS.  On October 21, APS moved to set aside default on the ground that the default was not willful but rather resulted from "miscommunications between APS and its outside counsel" and the need for APS to retain counsel licensed to practice in Massachusetts.  (Def.'s Mem. in Supp. of Mot. to Set Aside Default Entry 3).  On October 22, the court granted the motion and vacated the entry of default. The parties then engaged in fact discovery.

On November 7, 2019, more than a year later, attorney Lent filed an unopposed motion to withdraw his appearance, on the grounds that (1) APS had failed to fulfill its payment obligations, (2) continued representation would be an unreasonable financial burden, and (3) APS had stopped communicating with him.  (Mem. in Supp. of Mot. to Withdraw Appearance on Behalf of Def. 1).  On November 8, the court issued an order granting the motion effective December 3, 2019.  (Order on Mot. to Withdraw Appearance and for Stay of Discovery 1). Because APS is an LLC, and limited liability companies cannot litigate *pro se*, the court ordered that APS would be defaulted should no successor counsel enter an appearance by December 3, 2019.  (*Id.*)  No successor counsel appeared.  On December 6, the court entered a default against APS pursuant to Fed. R. Civ. P. 55(a).

On January 3, 2020, the EEOC filed a motion for default judgment.  The motion requests (1) back pay in varying amounts for the six individuals, totaling $62,262.75; (2) prejudgment interest in varying amounts for the six individuals, totaling $10,273.35; (3) $175,000 in compensatory damages for each individual, totaling $1,050,000; and (4) $175,000 in punitive

damages for each individual, totaling $1,050,000.  Because there is a $300,000 statutory cap on the sum of compensatory and punitive damages for each individual, *see* 42 U.S.C. § 1981a(b)(3)(D), the EEOC reduced its request for combined compensatory and punitive damages to $300,000 per individual, totaling $1,800,000.

The motion also requests injunctive relief, specifically (1) permanently enjoining APS from discriminating on the basis of religion in its employment practices; (2) permanently enjoining APS from retaliating against employees who have engaged in protected activity on the basis of religion; (3) requiring APS to institute a formal anti-discrimination policy that includes a procedure for religious accommodation requests; (4) requiring APS to provide an annual, in-person anti-discrimination training to its employees for a period of five years; and (5) requiring APS to submit semi-annual reports to the EEOC on all complaints of religious discrimination and attendance at its anti-discrimination trainings for a period of five years.

## III. <u>Analysis</u>

A default judgment may be entered without a hearing under Fed. R. Civ. P. 55(a) if "a court has jurisdiction over the subject matter and parties, the allegations in the complaint state a specific, cognizable claim for relief, and the defaulted party had fair notice of its opportunity to object." *In re The Home Restaurants, Inc.*, 285 F.3d 111, 114 (1st Cir. 2002).

Taking the well-pleaded factual allegations in the complaint as true, as well as the affidavits on file, the Court finds as a factual matter that defendant discharged the six PSAs because of their religion.  Because defendant has not defended against the claims, it has not demonstrated that it could not reasonably accommodate their request to wear long skirts without

undue hardship.[2]  Defendant therefore denied the six individuals reasonable accommodations and discharged then because of their religion in violation of § 703.  *See* 42 U.S.C. § 2000e-2(a)(1).  Defendant further discriminated against them by discharging them in retaliation for engaging in protected conduct in violation of § 704.  *See* 42 U.S.C. § 2000e-3(a).  Furthermore, this Court has jurisdiction over the matter, defendant has had fair notice of its opportunity to object, and the complaint states a cognizable claim for relief.  Judgment will therefore enter against defendant pursuant to Fed. R. Civ. P. 55(a).

The Court must next make an independent determination of the damages to be awarded, unless the amount of damages is a sum certain.  *See Pope v. United States*, 323 U.S. 1, 12 (1944) ("It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly."); *see also Credit Lyonnais Sec. (USA), Inc., v. Alcantara*, 183 F.3d 151, 155 (2nd Cir. 1999) ("Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of damages are not deemed to be true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty.") (citation omitted); *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983); *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).  Rule 55(b) provides that following an entry of default, the court *may* conduct a hearing in order to "conduct an accounting" or "determine the amount of damages."  Fed. R. Civ. P. 55(b)(2).  However, an evidentiary hearing is not required, and the court may rely solely upon

---

[2] The Court of course makes no findings or conclusions beyond the narrow confines of this case, which again involves a default.

documentary evidence and detailed affidavits. *See, e.g., HMG Property Inv'rs, Inc. v. Parque Indus. Rio Canas, Inc.*, 847 F.2d 908, 919 (1st Cir. 1988) (holding that district court did not abuse its discretion by declining to hold an evidentiary hearing on damages following default judgment, where its damages determination was supported by "substantial evidence . . . mortgage and loan agreements, certifications by taxing authorities, and other documents of record"); *In Re The Home Restaurants, Inc.*, 285 F.3d at 114 (holding that hearing to set damages following default was not necessary when the damages amount was supported by complaint, cross-claims, and affidavits); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir.1991) (holding that full evidentiary hearing to determine damages following default was not required when court considered "affidavits, evidence, and oral presentations by opposing counsel"); *Dundee Cement Co*, 722 F.2d at 1323 (holding that no hearing on damages was necessary where the amount claimed was "capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits"). The Court sees no need for such a hearing here.

### A.     Back Pay

The EEOC requests an award of back pay for each of the six individuals, totaling $62,262.75. Section 706 of Title VII provides that upon the finding of an unlawful employment practice, the court may order the recovery of back pay for up to two years preceding the filing of the charge with the EEOC. 42 U.S.C. § 2000e-5(g)(1). The purpose of the authorized back-pay remedy is to make an injured party whole, or in other words to place him "as near as may be, in the situation he would have occupied if the wrong had not been committed." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418-19 (1975) (quoting *Wicker v. Hoppock*, 73 U.S. 94, 99 (1867)). "[G]iven a finding of unlawful discrimination, back pay should be denied only for reasons

which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co.*, 422 U.S. at 421. Although back pay is a discretionary remedy, there is a "strong presumption" in favor of its award. *Arizona Governing Comm. for Tax Deferred Annuity and Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1091 (1983). An absence of bad faith on the employer's part is not a sufficient reason for denying back pay. *Id.* at 1092.

Here, the six individuals suffered economic harm when they were unlawfully terminated from APS and were, for the most part, unable to find comparably compensated employment. Awarding them back pay would serve the statutory purpose of making them whole for any injuries they may have suffered.

In calculating back pay, an individual is "entitled to recover for what he would have earned absent the discharge, reduced by any compensation that he actually received and any additional amount that he would have received through reasonable efforts to mitigate the damages, with the employer bearing the burden of proof on the issue of mitigation." *Carey v. Mt. Desert Island Hosp.*, 156 F.3d 31, 41 (1st Cir. 1998). Due to defendant's default, it has not met its burden of showing the amount by which the back pay award must be reduced through reasonable efforts to mitigate damages. At any rate, four of the six individuals (Abdi, Ali, Fatima Mohamud, and Sidik) did mitigate their damages by finding alternative employment, and they only seek back pay for periods of unemployment and to make up the wage differential between APS and their replacement jobs. (Abdi Decl. ¶¶ 8; Ali Decl. ¶¶ 7-8; Fatima Mohamud Decl. ¶¶ 7-9; Sidik Decl. ¶¶ 7-9). Maow and Khaibo Mohamud decided to refocus on school, which could be construed as a reasonable effort to mitigate their damages by taking steps to

enhance their employability.  (Maow Decl. ¶¶ 7-9; Khaibo Mohamud Decl. ¶ 8).  *See, e.g.*, *Ryan v. Raytheon Data Sys. Co.*, 601 F. Supp. 243, 252-53 (D. Mass. 1984) (awarding back pay for nine months in which a Title VII plaintiff attended school full time in pursuit of a master's degree following her unlawful termination, finding it a reasonable step to enhance her marketability).

Defendant terminated all of the complaining PSAs on January 14, 2017, and closed its Boston office in February 2018.  (Compl. ¶ 22; Slattery Dep. 59:6-11).  The Court agrees with plaintiff's calculation that the relevant back-pay time period is January 15, 2017 to February 1, 2018, or approximately 54.5 weeks.  Prior to their termination, the six individuals were paid $12 per hour with a monthly $50 stipend for public transportation.  (Pl.'s Mem. in Supp. of Mot. for Default J. 7).  The Court agrees with the EEOC's calculation of the appropriate amount of back pay for five of the six individuals, as supported by the affidavits.  The Court will award back pay as follows:  $2,390 to Sagal Abdi; $11,340 to Haredo Ali; $8,448 to Suad Maow; $5,600 to Fatima Mohamud; $16,296 to Khaibo Mohamud.  With respect to Tassabih Sidik, the Court will award $19,088.75, based on her affidavit.  That is $900 more than what the EEOC requests in its brief, and is based on the Court's independent calculation of the damages using the affidavit filed by Sidik.[3]

## B. **Prejudgment Interest**

The EEOC requests an award of prejudgment interest on the back-pay awards of each

---

[3] The Court found an arithmetic error in the EEOC's calculation of damages.  Specifically, the EEOC requested that Sidik be compensated for the $200 per week difference between her APS pay and her pay at the job that she held from December 1, 2017, to January 31, 2018.  (Sidik Aff. ¶ 9; Pl.'s Mem. in Supp. of Mot. for Default J. 11).  However, the EEOC erroneously estimated this period of unemployment as four weeks long, when in actuality it is approximately eight and one-half weeks long.  The extra four and one-half weeks, previously unaccounted for, raise the calculation of Sidik's back pay by $900.  This brings Sidik's back pay-eligible time period in line with that of the other defendants—that is, 54.5 weeks.

individual at a rate of 6.6%, totaling $10,273.35. The decision to award prejudgment interest in a Title VII case is within the discretion of the district court. *Conway v. Electro Switch Corp.*, 825 F.2d 593, 602 (1st Cir. 1987). The district court must evaluate whether prejudgment interest is necessary to make the injured party whole. *Id.* "Prejudgment interest is supposed to protect the value of an award against decrease in value from delay." *Kolb v. Goldring, Inc.*, 694 F.2d 869, 875 n.5 (1st Cir. 1982).

Here, three years have passed since the termination of the six individuals and defendant has twice defaulted, unnecessarily delaying the progress of this action. The Court finds that prejudgment interest is an appropriate remedy to make the individuals whole and protect their back-pay award from decrease in value caused by delay.

Like the decision to award prejudgment interest, the determination of the appropriate *rate* of prejudgment interest lies within the discretion of the district court. *E.E.O.C. v. O'Grady*, 857 F.2d 383, 391-92 (7th Cir. 1988); *E.E.O.C. v. Wooster Brush Co. Emps. Relief Ass'n*, 727 F.2d 566, 578-79 (6th Cir. 1984). The EEOC urges use of the interest rate set by the Internal Revenue Service on underpayments and overpayments of taxes pursuant to 26 U.S.C. § 6621. Indeed, various courts have used the IRS interest rates on tax penalties, as set forth in § 6621, to calculate prejudgment interest. *See, e.g.*, *E.E.O.C. v. Erie Cty.*, 751 F.2d 79, 82 (2nd Cir. 1984) (upholding district court's use of "adjusted prime rate", which is the rate set by the IRS for underpayment and overpayment of taxes as defined in 26 U.S.C. § 6621, to award prejudgment interest in FLSA action); *O'Grady*, 857 F.2d at 391-92 (upholding district court's use of IRS prime rate to calculate prejudgment interest in ADEA action); *Donovan v. Agnew*, 552 F. Supp. 1027, 1029 (D. Mass. 1982) (using "adjusted prime rate charged by banks" as set forth in 26 U.S.C. § 6621 to award prejudgment interest in FLSA action); *E.E.O.C. (U.S.A.) v. Pacific Press*

*Pub. Ass'n,* 482 F. Supp. 1291, 1319-20 (N.D. Cal. 1979), *aff'd sub nom. E.E.O.C. v. Pac. Press Pub. Ass'n,* 676 F.2d 1272 (9th Cir. 1982)  (using IRS underpayment/overpayment rate set in § 6621 to calculate prejudgment interest in Title VII action);  *Wirtz v. Kansas Farm Bureau Servs., Inc.*, 274 F. Supp. 2d 1215, 1223 (D. Kan. 2003) (same); *Miller v. Swissre Holding, Inc.*, 771 F. Supp. 56, 62 (S.D.N.Y. 1991) (same).

In computing prejudgment interest, it therefore appears reasonable to use the IRS interest rate.  However, there is not a single such rate.  In fact, § 6621 sets *five* different interest rates, depending on the circumstances:  (1) overpayment of taxes by individuals (3% plus the federal short-term rate); (2) overpayment of taxes by corporations (2% plus the federal short-term rate), (3) overpayment of taxes by corporations when such overpayment exceeds $10,000 (0.5% plus the federal short-term rate), (4) underpayment of taxes by individuals and non-large corporations (3% plus the federal short-term rate), and (5) underpayment of taxes by "large corporations"— that is, C corporations whose underpayment amount exceeds $100,000—(5% plus the federal short-term rate).  26 U.S.C. §§ 6621(a), 6621(c).  The "federal short-term rate" is set pursuant to 26 U.S.C. § 1274(d), published in IRS Revenue Rulings, and rounded to the nearest full percent for the purposes of calculating tax penalty interest rates.  26 U.S.C. §§ 6621(b), 1274(d).  The amount of prejudgment interest would thus vary based on the choice of IRS rate—as well as the time period for calculating interest, whether simple or compound interest is used, and (if compound interest) the compounding period.

The EEOC contends that the appropriate interest rate is 6.6%.  It calculated that rate by adding 5%, the base tax penalty for "large corporate" underpayments pursuant to 26 U.S.C. § 6621(c)(1), to 1.6%, the federal short-term rate for January 2020.  *See* Rev. Rul. 2020-1 (IRS RRU), 2020-3 I.R.B. 296, 2019 WL 6893790 (federal short-term rate for purposes of 26 U.S.C.

§ 1274(d) is 1.6%). The EEOC also contends that the appropriate time period for calculating prejudgment interest is from August 2017 (the approximate mid-point of the back-pay period, which is January 15, 2017, to February 1, 2018) to the date of judgment. *See, e.g.*, *Donovan*, 552 F. Supp. at 1029 (computing prejudgment interest on back pay from the median date of back-pay accrual period to date of its payment). The EEOC also uses simple, not compound, annual interest.

The EEOC made two errors in selecting an interest rate. First, it did not round the "federal short-term rate" from 1.6% to 2% as a base line for its calculation of the IRS tax penalty rate, as required by 26 U.S.C. § 6621(b)(3). Once rounded, the "large corporate" interest rate would be 7%, not 6.6%.[4]

Second, the EEOC used the "large corporation" penalty rate to calculate prejudgment interest, on the ground that defendant is a corporation. "Large corporation," for the purposes of § 6621, means a C corporation whose amount of tax underpayment exceeds $100,000. The Court does not agree that this interest rate is appropriate here. First, defendant APS is a limited liability company, not a C corporation, and the total amount of its underpayment of back pay to the individuals does not exceed $100,000. Furthermore, APS, which had approximately 1,100 employees during 2016-2017 and approximately 250 as of July 30, 2019, does not appear to be a particularly "large" company. (Slattery Dep. 58:4-13). More generally, using the "large corporate" underpayment interest rate—the highest tax penalty interest rate available—does not

---

[4] The EEOC could have avoided this problem by using IRS Revenue Ruling 2019-28, which includes a table of the five different classes of tax penalty interest rates contemplated by § 6621. *See* Rev. Rul. 2019-28 (IRS RRU), 2019-52 I.R.B. 1401, 2019 WL 6695461. The Revenue Ruling states that the appropriate tax penalty rates for the calendar quarter beginning January 2020 are "5 percent for overpayments (4 percent in the case of a corporation), 5 percent for underpayments, and 7 percent for large corporate underpayments. The rate of interest paid on the portion of a corporate overpayment exceeding $10,000 will be 2.5 percent." *Id.* The rates are the same for the quarter beginning April 2020. *See* Rev. Rul. 2020-7 (IRS RRU), 2020-12 I.R.B. 522, 2020 WL 993377.

accord with the purpose of awarding prejudgment interest, which is to make the injured parties whole. Prejudgment interest is intended to compensate, not punish. It would be more appropriate to use the individual overpayment/underpayment rate, which is 3% above the federal short-term rate, because that rate reflects the time value of money for individual taxpayers and can serve as a proxy for the time value of money for the six individuals here.

The individual tax overpayment/underpayment rate is currently 5% for the quarter beginning April 2020. Rev. Rul. 2020-7 (IRS RRU), 2020-12 I.R.B. 522, 2020 WL 993377. That rate has fluctuated between 4% and 6% from January 2017, when the individuals' back-pay period began, to present. *Id.* The Court finds that setting a prejudgment interest rate of 5%— which is equivalent to the IRS individual tax penalty for this quarter and a midpoint of the same penalty rate for the last three years—would fairly make the six individuals whole for the time value of their back pay.

The Court finds no reason to diverge from the EEOC's estimate of the relevant time period for prejudgment interest accrual (two and one-half years) or its choice of simple, rather than compound, interest. Therefore, using the same formula that the EEOC proposed, but with a 5% interest rate instead of 6.6%, prejudgment interest on back pay will be awarded as follows:

| Name | Back Pay | Interest | Interest Period | Prejudgment Interest (Back Pay x Interest x 2.5) |
|------|----------|----------|-----------------|-------------------------------------------------|
| Sagal Abdi | $2,390 | 5% | 2.5 years | $298.75 |
| Haredo Ali | $11,340 | 5% | 2.5 years | $1,417.50 |
| Suad Maow | $8,448 | 5% | 2.5 years | $1,056.00 |
| Fatima Mohamud | $5,600 | 5% | 2.5 years | $700.00 |
| Khaibo Mohamud | $16,296 | 5% | 2.5 years | $2,037.00 |
| Tassabih Sidik | $19,088.75 | 5% | 2.5 years | $2,386.09 |

## C.  **Compensatory Damages**

The EEOC requests compensatory damages in the amount of $175,000 for each individual for emotional distress and diminution of enjoyment of life. An injured party alleging

unlawful intentional discrimination under Title VII may recover compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. §§ 1981a(a)(1), (b)(3). The sum of compensatory damages and punitive damages may not exceed $300,000 for each complaining party in a case where the respondent had more than 500 employees in each of the 20 or more calendar weeks in the current or preceding calendar year. 42 U.S.C. § 1981a(b)(3)(D). The determining factor is number of the respondent's employees in the year in which discrimination occurred, not the year in which the damages award was made. *Hernandez-Miranda v. Empresas Diaz Masso, Inc.*, 651 F.3d 167, 175 (1st Cir. 2011). Because defendant here had approximately 1,100 employees in 2016 and 2017, the years in which discrimination occurred, the statutory cap for combined compensatory and punitive damages in this case is $300,000 for each aggrieved individual. (Slattery Dep. 58:8-13).

A court may award compensatory damages for emotional distress in a Title VII case even when the defendant's conduct does not cause "concrete psychological harm." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993). However, "although emotional damages are warranted even without medical or psychiatric evidence, the lack of such evidence is relevant to the amount of award." *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 35 (1st Cir. 1999) (citation omitted).

Here, none of the six individuals sought or received medical or psychiatric treatment as a result of their termination. The EEOC contends that they did suffer nonetheless from emotional distress. (Pl.'s Mem. in Supp. of Mot. for Default J. 13-14). The six individuals have filed affidavits to that effect:

1. Sagal Abdi alleges that as a result of her termination, she felt "emotional,"

"confused," "embarrassed," "sad," and "guilty." (Abdi Decl. ¶¶ 9-10). She lost her ability to financially support her family, limited her social outings and discretionary spending, and had to borrow money from her parents to pay back her student loans. (*Id*. ¶ 10). She "began questioning whether [she] would be accepted as a Muslim woman in America," despite her religion being "very important" to her. (*Id.* ¶ 9). She feared future workplace discrimination.

2. Haredo Ali alleges that as a result of her termination, she felt "sad," "shocked," "embarrassed," "crushed, confused, and cheated out of a job [she] loved." (Ali Decl. ¶¶ 9, 12). She enjoyed working at APS, especially with Somali clients, and enjoyed "seeing how happy they were when [Ali] looked like them and spoke the same language." (*Id.* ¶ 9). After her termination, Ali no longer felt safe to practice her religion. (*Id.* ¶ 10). She became socially isolated due to embarrassment from being fired. (*Id.* ¶ 12).

3. Suad Maow alleges that she was "upset," "hurt," and "embarrassed" by her firing. (Maow Decl. ¶ 10). She stated, "My religion is extremely important to me, is a big part of my daily life, and brings me happiness. I am proud to be Muslim. However, after APS fired me I realized that my religious clothing is not something I can hide or minimize from future employers that may wish to discriminate against me because of my religion. It was shock to me that discrimination could just seep into my professional life so easily and openly." (*Id*. ¶ 13).

4. Fatima Mohamud alleges that she was "upset, humiliated, and confused" as a result of her termination from a job that "brought [her] joy and relieved stress from school work and personal life." (Fatima Mohamud Decl. ¶ 9). Because she could no longer

financially contribute to support her family, which included 7 younger siblings, she felt "powerless and worried." (*Id.* ¶ 10). Her job search was very stressful because she worried about religious discrimination from future employers. (*Id.* ¶ 11).

5.  Khaibo Mohamud alleges that she felt "sadness, anger, and embarrassment" over being fired, which negatively affected her attendance and performance at school. (Khaibo Mohamud Decl. ¶ 11). In order to pay for school, she had to ask her family for assistance, take additional loans, and take a cash advance from the bank. (*Id.* ¶ 12). She had been using her income to help her single-parent family with the rent. After her termination, her mother had to get a second job, which caused Mohamud to feel "useless and worthless because of this added stress on [her] mom." (*Id.* ¶ 9). She also feared future religious discrimination, stating, "I had always viewed my religion positively as something that kept me grounded, guided me through life, and kept me sane during difficult times. When APS fired me, I suddenly worried that my religion would negatively impact my ability to work or secure a job. I was also angry and sad that I had been judged based on my religious clothing." (*Id.* ¶ 10).

6.  Tassabih Sidik alleges that she was "devastated," "upset," and "angry" upon losing a job that she enjoyed. (Sidik Decl. ¶ 10). She felt disillusioned from her previous belief that she was "blessed to live in a country that [she] believed respected all religions, including [her] Islamic faith" and feared future discrimination. (*Id.* ¶¶ 10-11). Due to the loss of her income, which had previously helped support her mother and younger siblings, her mother had to take a night shift job, which greatly diminished the amount of quality time the family could spend together. (*Id.* ¶ 12).

In the context of a default judgment, the Court accepts the allegations of the affidavits,

and therefore concludes that each of the six individuals has suffered emotional distress. However, the Court further concludes that an award of $175,000 for each individual is excessive under the circumstances.

In considering compensatory damages for emotional distress, "[a]wards in comparable cases are instructive." *Aponte-Rivera v. DHL Solutions (USA), Inc.*, 650 F.3d 803, 811 (1st Cir. 2011). In *Aponte-Rivera*, the First Circuit upheld the district court's award for $200,000 in emotional distress damages (remitted from the jury's award of $350,000) by comparing it to similar employment-discrimination cases where the First Circuit upheld emotional distress damage awards ranging from $37,500 to $350,000. *Id.* at 811-12. The plaintiff there showed that she had suffered from emotional distress due to a hostile work environment in which she was subject to derogatory remarks, intimidation, ridicule, and poor treatment based on her gender, but did not present evidence of medical treatment, long-term depression, or "notable evidence of outward manifestations of emotional distress." *Id.* at 811. The court found that although the jury may have been "generous," *id.* at 812, the damages amount was not "grossly excessive or so high as to shock the conscience of this court." *Id.* at 810 (quoting *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 773 (1st Cir. 2010)).

This Court is mindful that the $175,000 figure proposed by the EEOC is in line with compensatory damages awards upheld as "not grossly excessive" by the First Circuit. It does not follow, however, that this Court *must* award compensatory damages at the very high end of the range to the six individuals.

The *Aponte-Rivera* court compared the award to those in other cases, many of which were in higher amounts. 650 F.3d at 811-12. But district courts have also awarded much lower amounts in compensatory damages to similarly situated persons. For example, in *Ranquist v.*

*M&M Indus., Inc.*, the District of Maine awarded $25,000 in compensatory damages to a plaintiff who was unlawfully terminated on the basis of her gender. *Ranquist v. M & M Indus., Inc.,* 2012 WL 1899540, at *6 (D. Me. May 2, 2012), *report and recommendation adopted*, 2012 WL 1899438 (D. Me. May 23, 2012). Describing the plaintiff as a "vulnerable person living on the edge, a single mother supporting three sons," the court based its award on the "deprivations and hardships" that flowed from plaintiff's termination, including the loss of her car, loss of her apartment, shutoff of her power, needing to apply for welfare and food stamps, depression and anxiety that required medication, over-sleeping, and weight fluctuation. *Id.*

When analyzed as a whole, the case law suggests a number of factors that courts have considered when determining emotional distress damages: the degree of mental pain and anguish (such as feelings of depression, humiliation, or fear); physical manifestations of emotional distress (such as disordered sleeping or eating); the type of medical or other treatment, if any, sought; the effect on family members and family relationships; the economic hardships suffered as a result of the employment practice (such as bankruptcy, depleted retirement savings, or loss of housing); and the attachment that plaintiffs felt to their workplace (such as length of tenure or seniority).

This Court has carefully considered those factors in determining an appropriate compensatory damages award, and has concluded that each of the individuals should be awarded $75,000 in compensatory damages. Such an award is sufficient to compensate each individual for her emotional injury, without resulting in an excessive award. In contrast with some of the plaintiffs in comparable cases where higher compensatory damages were awarded and upheld, none of the six individuals in this case suffered from physical manifestations of their distress, such as inability to sleep or disordered eating. None sought or received medical treatment,

psychiatric or psychological treatment, or other counseling. None made a showing that she suffered from ongoing depression, anxiety, panic attacks, or post-traumatic stress disorder. None appear to have suffered a severe economic consequence, such as bankruptcy or losing a home. None appear to have suffered any long-term damage to their family relationships. And while Haredo Ali and Fatima Mohamud spoke directly about aspects of their job that they sincerely enjoyed and were sad to leave, each individual had worked at APS for no longer than a year prior to termination and being fired was not akin to stripping them of their livelihood and career.

Therefore, the Court awards $75,000 in compensatory damages to each of the six individuals, for a total of $450,000.

### D. <u>Punitive Damages</u>

The EEOC further requests punitive damages in the amount of $175,000 for each individual. Title VII authorizes punitive damages in "only a subset of cases involving intentional discrimination," depending on the state of mind of the employer. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999). Specifically, the complaining party must "demonstrate that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 535. The justification for punitive damages "lies in the evil intent of the defendant," and therefore "a positive element of conscious wrongdoing is always required." *Id.* at 538 (citations omitted). At the very least, the plaintiff must show that the employer "discriminate[d] in the face of a perceived risk that its actions will violate federal

law." *Id.* at 536.[5]

The decision to award punitive damages is in the discretion of the fact-finder. *McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 508 (1st Cir. 1996). "There is no vested right to punitive damages on the part of the plaintiff and where allowed, they are awarded as a matter of public policy to punish outrageous conduct by the defendant or to deter similar conduct in the future." *Id.*

Based on the pleadings, the affidavits of the six individuals, and the other exhibits presented by plaintiff, plaintiff has not made a sufficient showing that APS terminated the individuals with the requisite malice or reckless indifference to their federally protected rights. There are insufficient facts in the record to infer that APS, or Sean Slattery, the Vice President of Operations who personally fired all six individuals for failing to comply with APS's uniform policy, knew that this action violated federal law. Plaintiff cites the following deposition testimony as evidence of Slattery's guilty knowledge:

> Q. And are you aware of a federal law that says that you can't discriminate against an individual based on their religion in the employment context?
>
> A: Specifically, no. But yes. I mean, certainly I'm – I don't know how to explain how in-depth. I mean, I haven't read it, I haven't opened it, but I'm certainly aware that there are protections provided, yes.
>
> . . . .
>
> Q. Are you personally aware of any legal obligation to provide a religious accommodation to employees?
>
> A. Not specifically. Assumably [sic], yes.

---

[5] In *Kolstad*, the Supreme Court provided examples of when a finding of intentional discrimination would not give rise to punitive damages. 527 U.S. at 536-537. Specifically, this may occur when the employer is unaware of the relevant federal prohibition, believes that the discrimination is lawful, believes that its discrimination falls within a statutory exception such as "bona fide occupational qualification," or when the underlying theory of discrimination is novel or poorly recognized. *Id.*; *accord McDonough v. City of Quincy*, 452 F.3d 8, 24 (1st Cir. 2006).

Q. What does that mean?

A. Meaning I would understand that they have specific legal protections, and that if I was faced that with [sic] specific situation, I would have to research and ensure that I get the proper answer to the employee.

(Slattery Dep. 170:20-171:5; 172:22-173:9).

Slattery's testimony certainly demonstrates a general awareness that federal anti-discrimination laws exist. It does not, however, show that he knew that rejecting the individuals' requests for religious accommodation and refusing to allow them to wear long skirts violated federal law. "[R]ejection of a requested accommodation does not by itself suggest that the employer knew its conduct may be in violation of the law." *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 149 (1st Cir. 2009). As evidenced by the transcript, he did not seem to be aware of any "specific" "legal obligation to provide a religious accommodation to employees" by allowing them to wear long skirts, and there was a non-frivolous reason (safety) to refuse to do so.[6] Accordingly, his refusal to provide that accommodation, without more, does not evince malice or reckless indifference to the employees' federally protected rights.

The EEOC also cites, as evidence of Slattery's conscious wrongdoing, the fact that he asked a different Muslim employee, who did not maintain the practice of wearing a long skirt, to write a statement that he did not discriminate against her. (Pl.'s Mem. in Supp. of Mot. for Default J. 16). Certainly, this could be read as evidence that he feared legal action and had perceived a risk that terminating the six individuals violated federal anti-discrimination laws. Conversely, this could be read as evidence that he (wrongly, but in good faith) believed that he did not generally discriminate against Muslim employees who complied with the uniform policy,

---

[6] There is no evidence that Slattery viewed the requirement of "modest" dress to be degrading or demeaning to women.

and that it was lawful to terminate employees who did not comply. In other words, this action by Slattery could demonstrate that he was simply unaware of the relevant federal statute, 42 U.S.C. § 2000e (j), that defines religious discrimination as including the obligation to reasonably accommodate a religious practice unless it places undue hardship upon the business, and was therefore unaware of APS's legal obligation to offer the six individuals a reasonable accommodation to its uniform policy. This is squarely within the category of situations where the "employer is unaware of the relevant federal prohibition or discriminates with the distinct belief that its discrimination is lawful" contemplated by the Supreme Court in *Kolstad*, where punitive damages are not justified. *Kolstad*, 527 U.S. at 527.

Because the EEOC has not shown that defendant terminated the six individuals despite knowing that its actions violated federal law, the Court declines to award punitive damages.

###    E.    <u>Injunctive Relief</u>

Finally, the EEOC requests that the Court grant injunctive relief (1) permanently enjoining defendant from engaging in employment practices that discriminate on the basis of religion; (2) permanently enjoining defendant from retaliating against employees who have engaged in protected activity on the basis of religion; (3) requiring defendant to institute an anti-discrimination policy that includes a procedure for making religious accommodation requests; (4) requiring defendant to provide annual, in-person anti-discrimination training to its employees, with a special emphasis on laws prohibiting religious discrimination and retaliation and related issues, for five years; and (5) requiring defendant to submit detailed semi-annual reports to the EEOC on all complaints of religious discrimination and employee attendance at its anti-discrimination trainings for five years.

Title VII § 706 authorizes a court, upon finding that an employer has intentionally

engaged in an unlawful employment practice, to "enjoin the respondent from engaging in such unlawful employment practice" and to order "equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1).  In a Title VII action, "the issuance of an injunction rests in the sound discretion of the district court."  *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1135 (8th Cir. 1981).

Permanent injunctive relief should be narrowly tailored.  Rule 65(d) states that "[e]very order granting an injunction . . . must . . . state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  The rule is not a mere technicality, but rather "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood."  *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).  Generally, injunctions must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Various appeals courts have struck general "obey the law" injunctions in Title VII cases as vague, overbroad, and failing to give sufficient notice to defendants consistent with principles of due process.  For example, the First Circuit has rejected a district court's order enjoining a university from discriminating against its faculty members on the basis of gender.  *Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 361 (1st Cir. 1989).  The court found that such a broad injunction "has the potential to further embroil the courts in the University's internal affairs, allowing faculty members to circumvent administrative procedures by simply invoking the contempt jurisdiction of the district court whenever a dispute arises."  *Id.*  "Ordinarily, classwide relief, such as the injunction here which prohibits sex discrimination against the class of Boston University faculty, is appropriate only where there is a properly certified class."  *Id.  See also Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251, 263 (8th Cir. 1985) (striking as overbroad an

injunction against race-based discrimination at all company facilities and affiliates because it went "far beyond the employment practices challenged," and remanding the case for modification of the injunction to apply only to practices at the St. Louis location that was at issue in the lawsuit); *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895, 897-98 (5th Cir. 1978) (vacating "obey the law" injunction prohibiting employer from discriminating against all persons in a particular facility as overbroad); *Keyes v. Sch. Dist. No 1, Denver, Colo.*, 895 F.2d 659, 668 (10th Cir. 1990) (vacating "obey the law" injunction" in school desegregation case); *E.E.O.C. v. BNSF Ry. Co.*, 902 F.3d 916, 929 (9th Cir. 2018) (vacating nationwide injunction against employer in ADA action because district court had not made "adequate factual findings to support the scope of the injunction," where plaintiff only made a showing of unlawful behavior in one office). *But see also United States v. Miller*, 588 F.2d 1256, 1261 (9th Cir. 1978) (upholding "obey the law" injunction that merely echoed statutory text in Interstate Commerce Act case because "statutory terms adequately describe the impermissible conduct"); *E.E.O.C. v. AutoZone, Inc.,* 707 F.3d 824, 844 (7th Cir. 2013) (finding that an injunction ordering defendant to generally comply with reasonable accommodation provision of the ADA could be appropriate, but remanding for district court to set a time limit).

Here, the first and second parts of the proposed injunction essentially command defendant to obey the law concerning religious discrimination and retaliation. Such an injunction is vague, overly broad, and does not provide defendant with adequate notice of the specific acts prohibited.

A court may, however, issue an injunction in a Title VII case when necessary to prevent future discrimination of the kind contemplated in the lawsuit. The court has the authority to restrain not only the exact same act as the one found unlawful, but also acts that "are of the same

type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Brown*, 891 F.2d at 361 n.23 (quoting *N.L.R.B. v. Express Publishing Co.*, 312 U.S. 426, 435 (1941)) (vacating injunction against gender-based discrimination regarding all faculty members, where plaintiff only made a showing of discrimination in her specific case, but upholding orders reinstating plaintiff and prohibiting gender-based discrimination regarding plaintiff's future promotion, salary, or other benefits). In order for the court to issue such an injunction against possible future discrimination, "the moving party must demonstrate that there exists some cognizable danger of recurrent violations, something more than a mere possibility." *E.E.O.C. v. General Lines, Inc.*, 865 F.2d 1555, 1565 (10th Cir. 1989) (citing *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)).

Here, the EEOC has not shown a cognizable danger of future religious discrimination of the same type or class as that demonstrated in this suit should this Court fail to issue the suggested injunction. The six individuals are not requesting reinstatement and therefore do not face future religious discrimination by way of a failure to accommodate their requested deviations from the uniform policy. Nor could they be reinstated if they so requested, as APS has closed all its locations in Massachusetts. (Slattery Dep. 59:2-11). The EEOC has not shown that there was any religious discrimination or failure to provide reasonable religious accommodation at defendant's nine remaining locations, or that there were company-wide policies that influenced the Boston office's refusal to provide reasonable accommodation to the complaining PSAs. (Slattery Dep. 50:14-19 for the "nine locations" figure.) It presented no evidence of a company-wide hostile work environment. Instead, the discriminatory act in question appears to have consisted of a single act by a single manager of failing to provide a

religious accommodation to defendant's uniform policy, in an office that has since been closed.

Accordingly, the Court declines to provide the injunctive relief requested by the EEOC. It is unclear what purpose the requested equitable relief would serve, and the EEOC has not demonstrated a cognizable danger of future religious discrimination in defendant's nine remaining locations. The Court will, however, retain jurisdiction over this matter for two years, and reserves the right to issue injunctive relief should it become necessary, for example, if defendant resumes operations in Massachusetts and/or fails to offer reasonable religious accommodations to people of the same type or class as the complaining PSAs in this case.

## IV.   Conclusion

For the foregoing reasons, judgment shall enter for plaintiff the Equal Employment Opportunity Commission, as follows:

1. Each aggrieved individual is awarded back pay as follows:

    a. Sagal Abdi: $2,390.00

    b. Haredo Ali: $11,340.00

    c. Suad Maow: $8,448.00

    d. Fatima Mohamud: $5,600.00

    e. Khaibo Mohamud: $16,296.00

    f. Tassabih Sidik: $19,088.75

2. Each aggrieved individual is awarded prejudgment interest as follows:

    a. Sagal Abdi: $298.75

    b. Haredo Ali: $1,417.50

    c. Suad Maow: $1,056.00

    d. Fatima Mohamud: $700.00

     e.   Khaibo Mohamud: $2,037.00

     f.   Tassabih Sidik: $2,386.09

3.   Each aggrieved individual is awarded $75,000 in compensatory damages for emotional distress.

4.   The Court hereby retains jurisdiction of this action for two years from the date of this Memorandum and Order.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor, IV
Chief Judge, United States District Court

Dated:  April 1, 2020